IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK ACCOUNTS 100019328776112, 100045446742065, 100011753645417, 100051694651000, 100018119105767, 100036235840135, AND 100015724485652 THAT ARE STORED AT PREMISES CONTROLLED BY META PLATFORMS, INC. | Case No. \_\_\_4:23mj7_____<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Ryan Kennedy, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with certain Facebook accounts that are stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), a company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government records and other information in its possession, pertaining to the subscriber(s) or customer(s) associated with the accounts.

2. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since August 2021. I currently work in the FBI Richmond, Virginia, Field Office, Roanoke Resident Agency. I am assigned to work a variety of criminal and national security matters, including the investigation of violent crimes, narcotics offenses, and major

offenses such as federal bank robberies and the apprehension of federal fugitives. I have received training and gained experience in conducting investigations, interviewing and interrogation techniques, arrest procedures, search warrant applications, the execution of searches and seizures, computer crimes, computer evidence identification, and various other criminal laws and procedures.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1951 have been committed by Dimitri Green, Javiere Green, Sheldon Moffett Jr., and other known and unknown individuals. There is also probable cause to search the information described in Attachment A for evidence of these crimes as described in Attachment B.

## PROBABLE CAUSE

5. On September 13, 2022, the FBI received a tip regarding a robbery that had occurred at the Walmart in Rocky Mount, VA, located within the Western District of Virginia. The FBI then contacted the store manager, who advised that, according to records he had access to, the group that had robbed the Rocky Mount Walmart was responsible for robbing approximately 26 Walmarts in five different states over the past year. He referred the FBI to a Walmart Global Investigator, identified in this affidavit as R.S. After discussing the matter with R.S., the FBI learned that up to five individuals were involved in approximately 26 robberies resulting in the theft of over $200,000 worth of goods. R.S. provided a synopsis of each of the

robberies, which included dates, locations, details, and photographs. R.S. also advised that he was in the process of collecting video surveillance footage from each of the stores.

6. On October 27, 2022, and November 2, 2022, the FBI served search warrants that had been authorized by this Court on T-Mobile, Verizon, AT&T, and US Cellular requesting cell tower data at five locations where Walmarts had been robbed by the aforementioned group of individuals. In addition to the Rocky Mount Walmart, these Walmarts were located in Albemarle, North Carolina (where a robbery occurred on August 12, 2022); Greensboro, North Carolina (where a robbery occurred on August 29, 2022); Johnson City, Tennessee (where a robbery occurred on September 14, 2022); and Martinsville, Virginia (where a robbery occurred on September 16, 2022). An analysis of the cell tower data provided by AT&T revealed that two phones that were each present at both the Greensboro and Martinsville Walmarts around the time those stores were robbed were both in contact with phone number (704) 779-3654 at around the time of the Greensboro robbery. One of those phones, (704) 949-9336, is known to be associated with Javiere Dominique Green and was also in contact with (704) 779-3654 during the Martinsville robbery.

7. On November 18, 2022, the FBI served a Grand Jury subpoena on AT&T requesting the subscriber info for (704) 779-3654. According to the results provided by AT&T, phone number (704) 779-3654 belongs to an account under the name of Shavone Johnson. Open-source research has revealed that this phone number is associated with Dimitri Jontae Green and that Green shares an address with Shavone Johnson in Charlotte, North Carolina.

8. On or around February 7, 2023, a Walmart in Marion, South Carolina, was robbed. The suspects stole almost $30,000 worth of Apple electronics. The Marion County Sheriff's Office got into a vehicle chase with the suspects' vehicle, a gray Dodge Charger, and noted that the car

had a North Carolina license plate, tag number EBC-4126. The plate came back to Russell Green from Hamlet, North Carolina. In an interview with police, Russell Green stated that the vehicle was a 2015 Dodge Charger and that it belonged to his son. He has two sons, Javiere Dominique Green and Dimitri Jontae Green. According to surveillance footage from Walmart robberies that occurred on September 23, 2022, in Dahlonega, Georgia, and on September 24, 2022, in Anderson, South Carolina, the getaway vehicle used by the suspects was a gray Dodge Charger.

9. On August 12, 2022, at approximately 6:16 a.m., a juvenile male identified as Sheldon Moffett Jr. and another unknown male entered the Walmart at 781 Leonard Avenue, Albemarle, NC. They selected a duffle bag from the luggage area of the store and proceeded to the electronics area where Moffett gained access to the smartwatch cage. Moffett took numerous smartwatches and concealed them in the duffel bag. After the other male retrieved another duffel bag, the two individuals loaded the second bag with smartwatches and then ran through the store and out the exit with the smartwatches. They departed in a silver Jeep SUV that has been involved in other Walmart robberies. The dollar amount of the stolen smartwatches was determined by Walmart investigators to be $10,498.32.

10. In March 2023, open-source searches identified the Facebook page 'FatBOii Bam,' with User ID 100019328776112, as being associated with Dimitri Green. A review of this account identified six posts, made between April 25, 2022, and January 30, 2023, offering up 13 separate models of phones, tablets, watches, laptops, and gaming systems for sale still in their factory packaging. Open-source searches also revealed that the Facebook page 'Bam Green', with User ID 100045446742065, is also associated with Dimitri Green.

11. Open-source searches on Javiere Green identified three Facebook pages associated with him: 'Hdm Javiere,' User ID 100011753645417; 'Vierelo,' User ID 100051694651000; and 'Vierelo (Givenchy),' User ID 100018119105767.

12. Open-source searches on Sheldon Moffett Jr. identified two Facebook pages associated with him: 'ChoppaBoy Sheldon,' User ID 100036235840135, and 'Trapboy Sheldon,' User ID 100015724485652.

13. On March 3, 2023, preservation letters were sent to Meta requesting the preservation of the above-mentioned Facebook User IDs.

## BACKGROUND CONCERNING FACEBOOK[1]

14. Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com. Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

15. Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter. This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Each Facebook user is assigned a user identification number and can choose a username.

---

[1] The information in this section is based on information published by Meta on its Facebook website, including, but not limited to, the following webpages: "Privacy Policy," available at https://www.facebook.com/privacy/policy; "Terms of Service," available at https://www.facebook.com/legal/terms; "Help Center," available at https://www.facebook.com/help; and "Information for Law Enforcement Authorities," available at https://www.facebook.com/safety/groups/law/guidelines/.

5

16. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

17. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

18. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or

her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

19. Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes. Users can "tag" other users in a photo or video and can be tagged by others. When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

20. Facebook users can use Facebook Messenger to communicate with other users via text, voice, video. Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

21. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

22. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

23. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

24. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the

account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

25. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

26. In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that user's access or use of that application may appear on the user's profile page.

27. Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform. For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

28. Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks in" to an event, or tags a post with a location.

29. Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

30. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

31. Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

32. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Meta to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

33. Based on the foregoing, I request that the Court issue the proposed search warrant.

34. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Meta. Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

35. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. *See* 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is a "district court of the United States . . . that . . . has jurisdiction over the offense being investigated."

## REQUEST FOR SEALING

36. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Facebook returns are often voluminous and can take months to review even by the most diligent and dedicated agents. Often, the review of one social media account may lead to further investigation necessitating additional search warrants for other social media accounts. If the users of these Facebook accounts learn that their accounts are being reviewed, that could result in efforts to delete other relevant social media accounts, resulting in the loss of evidence. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Ryan Kennedy
Special Agent
FBI

Subscribed and sworn to before me on _____April 3_____, 2023

*Robert S. Ballou*

The Honorable Robert S. Ballou
UNITED STATES DISTRICT JUDGE